UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JACOB ANDREWS, Personal
Representative of the Estate of Angela
White, Deceased,

                    Plaintiff,

v.

WAYNE COUNTY, a Political
Subdivision of the State of Michigan,

                    Defendant.

_____/

Case No. 17-cv-11684

Paul D. Borman
United States District Judge

Mona K. Majzoub
United States Magistrate Judge

## OPINION AND ORDER GRANTING DEFENDANT WAYNE COUNTY'S MOTION FOR SUMMARY JUDGMENT (ECF #37)

## I.      BACKGROUND

Thirty-nine year-old Angela White was a pre-trial detainee in the Wayne County Jail ("Jail") who died on June 8, 2014 after purposely ingesting over 40 pills of a blood pressure medication, Verapamil. White, who was allowed to keep the Verapamil in her cell according to the Jail's "Keep on Person" ("KOP") self-administered medication policy, had been in the Jail's custody for less than 24 hours before she fatally overdosed. On May 26, 2017, Plaintiff Jacob Andrews, the personal representative for White's estate and White's long-time fiancé and the father of their then-three year-old child, filed this action under 42 U.S.C. § 1983, alleging that Defendant Wayne County policy established deliberate indifference to

1

White's medical needs.[1] Before the Court is Defendant Wayne County's Motion for Summary Judgment. (ECF #37.) On May 10, 2019, Defendant filed the instant Motion. On June 13, 2019, Plaintiff filed his Response. (ECF #44.) On June 27, 2019, Defendant filed its Reply. (ECF #45.) The Court held a hearing on July 18, 2019.

## II.    FACTS

### A. White's Arrest and Detainment

Both Parties agree that the essential facts of this case are not in dispute. (Def.'s Mot., ECF #37, PgID 504; Pl.'s Resp., ECF #44, PgID 1118.) In the early morning hours of June 5, 2014, Plaintiff Jacob Andrews called 911 after White threatened to stab him with a knife when he returned home in Canton, Michigan. (Dep. of Jacob Andrews, June 28, 2018, ECF #37-4, PgID 566, 43:20-44:22.) Andrews and White had been dating for four years, were engaged to be married, and had a three-year old daughter together. (*Id.* at PgID 557-58, 9:23-10:5.)

Canton Police responded to Andrew's call, arrested White, and took her to the Canton Police Department Jail. (*Id.* at PgID 567, 47:18-25.) That same day, Plaintiff Andrews came to the Canton Police Department Jail twice to drop off

---

[1] Plaintiff filed the First Amended Complaint on March 7, 2019, after the Court granted Defendants Sheriff Benny N. Napoleon and Dr. Mouhanad Hammami's Motion for Judgment on the Pleadings (ECF #11), as the claims against them in their official capacities were duplicative of the claims against the remaining Defendant in this matter, Wayne County.

White's six medications. (Andrews Dep., ECF #37-4, Def.'s Mot. Ex. C, PgID 567, 47:18-25.) He did not speak with White. (*Id.*) Andrews did not mention any concerns about White's mental health status to anyone at the Canton Police Department.[2] (*Id.* at PgID 569, 56:10-12.) When White was first taken into custody, Andrews indicated that he wanted to press charges. (*Id.* at PgID 569, 54:2-6.) However, Andrews testified that he had changed his mind by the time he came to the Canton Police Department Jail to drop off White's medications, and no longer wanted to press charges against her, *but* he did not inform the police of his change of heart. (*Id.* at PgID 569, 55:11-20.) Around 8:00 p.m. that evening, White was taken from the Canton Jail to Oakwood Hospital after complaining of chest and back pain. (ECF #44-6, Pl.'s Resp. Ex. 5, EMS Transport Record, PgID 1180.) She was released from Oakwood Hospital at 2:15 a.m. on June 6, 2014, and was

---

[2] Plaintiff Andrews, White's fiancé, testified at his deposition on June 28, 2018:

> Q: Did you ever think that Angela was suicidal?
> A: No
> …
> Q: Was there ever a time in your relationship with her that you felt
> or thought Angela would harm herself?
> A: No.

(Andrews Dep., ECF #37-4, Def.'s Mot. Ex. C, PgID 564, 37:2-3, 21-23.)

Plaintiff Andrews also testified that he was not aware of Angela White having any thoughts of taking her own life. (*Id.* at PgID 571, 63:19-22.)

transported back to the Canton Jail. (ECF #44-5, Pl.'s Resp. Ex. 4, Canton Police Records, PgID 1175.)

Later on June 6, 2014, White was arraigned in the 35th District Court. (ECF #37-5, Def.'s Mot. Ex. D, 35th Dist. Court Records, PgID 589.) Bail was set at $3,000, with allowance for posting a 10 percent cash/surety bond ($300). (*Id.*) A preliminary examination was scheduled for June 20, 2014. Plaintiff Andrews did not post White's bond. (*Id.*) That evening, around 7:00 p.m., White was transferred to the Wayne County Jail. (ECF #37-6, Def.'s Mot. Ex. E, History of Inmate Report, PgID 594.)

White's six medications were sent with her from Canton to the Wayne County Jail. These medications and the prescribed dosages included: (1) Klonopin (0.5 mg tablet, twice daily; 1 mg tablet, "until gone;" 0.5 mg tablet, "until gone"); (2) oxygen ("2 liters via nasal cannula as needed for cluster headaches"); (3) Sumatriptan (0.5 ml subcutaneous injection, every 12 hours as needed "in clinic"); (4) Lexapro (20 mg tablet, once daily for 45 days; (5) Toradol (30 mg intramuscular injection, as needed); and (6) Verapamil (80 mg, 1 tablet, 4 times daily). (ECF #37-8, Def.'s Mot. Ex. G, Jail Medical Records, PgID 618.)

All incoming Wayne County Jail inmates receive a medical and mental health care screening within four hours of arrival booking, according to the Jail's "Receiving Screening – Intake" policy. (ECF #47, Def.'s Mot. Ex. F, Receiving

4

Screening Policy, PgID 1439.) White's intake and health screenings complied with this policy. Around 8:39 p.m. on June 6, 2014, approximately one and one-half hours after White was booked into the Jail, Medical Assistant Dawn Benette met with White and conducted the initial intake screening questionnaire, which covered physical and mental health. (ECF #37-8, Def.'s Mot. Ex. G, Jail Medical Records, PgID 619-21.) The questionnaire included issues such as present mental status, prior suicide and/or self-harm attempts, suicidal ideation, and mental illness treatment. (*Id.*) The questionnaire covered both the intake screener's observations of the inmate as well as the inmate's answers to particular questions. (*Id.*)

Although White had responded "yes" to the question of whether she had previously attempted to harm herself or commit suicide, Benette recorded that White stated that the attempt had occurred "in the past," and further, that White was not thinking of harming herself now and that suicidal thoughts were now not a problem. (*Id.*) The time "in the past" was not specified. White generally responded "no" to the other mental health/status questions. Benette noted that White did not appear depressed and was in a stable mental condition. (*Id.*) Specific Questions and Responses were:

> Was the inmate taken to the hospital prior to arrival at intake?
> **Yes**
> Explain: [Blank]
> …
> Is the Inmate taking medications?
> **No**

5

Explain: [Blank]

Is the Inmate carrying any medications?
 **No**
 Explain: [Blank]
…
How would you describe your present state of health?
 **Good**
 Explain: [Blank]
…
Do you have or have you ever had seizures?
 **Yes**
 Explain: [Blank]
…
Have you ever attempted to harm yourself or commit suicide?
 **Yes**
 Explain: In the past

Are you thinking of harming yourself or are suicide thoughts a problem now?
 **No**
 Explain: [Blank]

Do you have a history of psychiatric illness or treatment?
 **No**
 Explain: [Blank][3]

---

[3] Plaintiff argues that there are inconsistencies in White's responses, as she clearly was prescribed and had brought to the Jail two psychotropic medications, and six medications in total. However, this position is irrelevant to White's claims, as there are no allegations by Plaintiff's Counsel that the "Receiving Screening – Intake" policy was deficient or related to White's death. Plaintiff argues instead that the KOP policy, discussed *infra*, "superseded" the intake information. (Pl.'s Resp., ECF #44, PgID 1133.) Moreover, R.N. Raymond Carnill's decision to allow White's participation in the KOP program was not made based on her responses to the initial intake questionnaire. Carnill permitted White to participate based on his assessment and conclusion that she was not at risk of harming herself and therefore would be housed in the general population (which included the infirmary). (Dep. of R.N. Raymond Carnill, July 19, 2018, ECF #37-10, Def.'s Mot. Ex. I, PgID 699, 33:13-24, PgID 707-08, 65:2-66:9.)

…
Is the inmate acting and/or talking in a strange or unusual manner?
> **No**
> Explain: [Blank]

Does the inmate show signs of depression (crying, emotional flatness, apathy, lethargy)?
> **No**
> Explain: [Blank]

Does the inmate appear overly anxious, afraid, or angry?
> **No**
> Explain: [Blank]

Does the inmate appear unusually shy or ashamed?
> **No**
> Explain: [Blank]

Does the inmate have any visible signs or scars from previous suicide attempts?
> **No**
> Explain: [Blank]

Does the inmate report a history of drug use?
> **No**
> Explain: [Blank]

(*Id.*) (Emphasis in original.)

After completing the questionnaire with White, Benette referred White for medical and mental health follow-up evaluations and recorded the following "Medical Disposition Instructions:"

> General Population – No follow-up needed at this time
> Cleared for facility work: No
> Refer to Medical for Evaluation: Yes
> Refer to Mental Health for Evaluation: Yes

(*Id.* at PgID 621.)

Benette referred White for medical and mental health follow-up to address her complaint of a headache and her need for prescription medication orders. (ECF #37-8, Def.'s Mot. Ex. G, Jail Medical Records, PgID 619-21; Dep. of R.N. Raymond Carnill, July 19, 2018, ECF #37-10, Def.'s Mot. Ex. I, PgID 698, 29:2-8.)

Registered Nurse Raymond Carnill conducted White's follow-up evaluations around 10:15 p.m. on June 6, 2019. (ECF #37-8, Def.'s Mot. Ex. G, PgID 622.) Carnill had been a registered nurse for 18 years and had worked at the Jail for eight years. (Carnill Dep., ECF #37-10, PgID 693, 7:1-12.) During his two-hour meeting with White, Carnill contacted a pharmacy to verify the prescriptions for White's six medications that she had brought with her, and he contacted the on-call physician to have the medications ordered so Carnill could administer those to White in the Jail. (ECF #37-8, Def.'s Mot. Ex. G, Jail Medical Records, PgID 622; Carnill Dep., ECF #37-10, Def.'s Ex. I, PgID 699, 30:21-31:7.) He documented that her chief complaints were anxiety and depression,[4] and that she also suffered from cluster

---

[4] This is an important distinction from Plaintiff's contention that Jail staff "observed" that White was depressed. (*See, e.g.,* Pl.'s Resp., ECF #44, PgID 1132-33; Def.'s Mot. Ex. G, ECF #37-8, Jail Medical Records, PgID 620.) For example, several of the intake questions filled out by Benette and cited by Plaintiff have verbiage appearing between the question line and the "explain" line. The question, "Does inmate show signs of depression?" includes a line under it, which says, "Inmate appears depressed." (*Id.*) There is also a line under the question, "Does the inmate

headaches. Carnill treated White for the cluster headache that she was currently experiencing, and noted that her headache resolved with medication. (ECF #37-8, Def.'s Mot. Ex. G, Jail Medical Records, PgID 622.)

Carnill did not review the earlier questionnaire that White had completed with Benette. (Carnill Dep., ECF #37-10, Def.'s Ex. I, PgID 706, 61:4-15.) However, Carnill completed a second questionnaire with White, which stated that White "deinies [sic] being suicidal or homicidal" under the section listing her prescribed psychotropic medications. (*Id.* at PgID 628.) Carnill documented White's appearance as "clean, neat," her behavior as "soft," her speech as "cooperative," and her mood as "anxious." She reported "little sleep" and had refused food. No specific "[t]hinking" was of note. (*Id.* at PgID 629.)

After this evaluation was complete, Carnill decided to house White in the infirmary,[5] which was adjacent to the medical clinic, so she would have access to

---

have any visible signs or scars from previous suicide attempts?" that states, "Scars from suicide attempts," but, again, the response is "No." (*Id.* at PgID 621.) There are no allegations that Benette noticed scars from a previous suicide attempt, or that White had any such scars. (*Id.*) None of the other wording in between the question and the explanation, besides the single line in the particular question about depression, is pointed to by Plaintiff as part of White's answers. This is Plaintiff's only evidence that any Jail staff "observed" that White was depressed.

[5] The infirmary is a "medical special housing area that is proximate or adjacent to the medical clinic…[T]he infirmary would be a place where [White] could have access to [her] oxygen PRN or as needed for her migraines." (Dep. of Dr. Keith Dlugokinski, Wayne County Jail Director of Jail Health Services, ECF #37-9, Def.'s

her oxygen tank as needed. He did not at any point consider her for placement in the mental health unit because that housing unit is reserved for inmates acutely mentally ill, and White appeared psychiatrically stable, had not exhibited any suicidal tendencies or other psychiatric illness, and denied thoughts of self-harm. (Carnill Dep., PgID 707-08, 65:5-67:1; Dep. of Dr. Keith Dlugokinski, Wayne County Jail Director of Jail Health Services, ECF #37-9, Def.'s Mot. Ex. H, PgID 658, 79:23-80:6.) Carnill testified that if he had perceived that White was going to harm herself, he would have called the psychiatrist and admitted her to mental health unit under suicide precautions. (*Id.*) Carnill referred White for later follow-up with a mental health social worker, but he did so because of the two psychotropic medications that she was prescribed and not due to any housing decision issues. (Carnill Dep., ECF #37-10, Def.'s Mot. Ex. I, PgID 706, 58:20-59:16.) There were no Wayne County Jail policies that prevented Carnill from placing White in the Mental Health Unit. (*Id.* at PgID 708, 66:3-9; Dep. of Dr. Thomas Clafton, Wayne County Jail Medical Director, July 25, 2018, ECF #37-18, Def.'s Mot. Ex. Q, PgID 827, 79:19-80:14.)

Under the KOP policy, psychotropic and other restricted medications were not provided to inmates for self-administration. White was permitted to possess

---

Mot. Ex. H, PgID 664, 102:4-14.) The infirmary is a subsection of general population housing.

Verapamil, a non-restricted blood pressure medication. (ECF #37-11, Def.'s Mot. Ex. J, KOP Policy, PgID740.) The policy permitted White to self-administer Verapamil, and to keep a 20-30 day supply. Accordingly, Carnill allowed White to retain approximately 76 tablets of Verapamil for self-administration. (ECF #37-17, Def.'s Mot. Ex. P, Post Mortem Report, PgID 800.) Dr. Keith Dlugokinski testified that it was standard practice under the KOP program to allow participating inmates to keep 20-30 days of non-restricted medication in their cells.[6] (Dlugokinski Dep., ECF #37-9, Def.'s Mot. Ex. H, PgID 646, 31:5.) White had been prescribed 4 tablets of Verapamil per day.  (ECF #37-8, Def.'s Mot. Ex. G, Jail Medical Records, PgID 618.)

The next day, June 7, 2019, between 2:30 and 3:00 p.m., White made twelve phone calls – six of which were to Plaintiff Jacob Andrews. (ECF #37-12, Def.'s Mot. Ex. K, Phone Records, PgID 749.) None of the twelve calls were answered. (*Id.*) White was subsequently returned to her cell. Wayne County Sheriff's Deputy Christopher Paulsen conducted a routine security round at the time White was returned, and noted that the infirmary was secure. (ECF #37-13, Def.'s Mot. Ex. L, Jail Activity Log, PgID 751.)

---

[6] Nurse Raymond Carnill testified that he was not "aware of" a limitation on the number of pills that inmates participating in the KOP program were permitted to have at any one time. (Carnill Dep., ECF #37-10, Def.'s Mot. Ex. I, PgID 705, 56:3-6.)

At approximately 4:25 p.m. on June 7, 2014, Deputy Paulsen responded to White's cell after hearing knocking. (ECF #37-14, Def.'s Mot. Ex. M, Incident Report, PgID 756.) He saw White sitting on the floor with vomit on her face, and White informed him that she did not feel well. (*Id.*) Deputy Paulsen immediately called for medical personnel, and Nurse Rhonda Harris responded to White's cell. (*Id.*) Nurse Harris called to Nurse DeAngeles Guest for assistance. (*Id.*) White informed the nurses that she had taken too many blood pressure pills. (*Id.*) Nurse Guest took her blood pressure; it was low. (Dep. of DeAngeles Guest, July 19, 2018, ECF #37-15, Def.'s Mot. Ex. N, PgID 763, 21:7-19.) The nurses attempted to keep her alert and elevated her legs. (*Id.*) White remained conscious during this time. (*Id.* at PgID 764, 25:6-8.) EMS arrived at the Jail at approximately 5:00 p.m. (ECF #37-14, Def.'s Mot. Ex. M, Incident Report, PgID 756.) EMTs attempted for approximately 30 minutes to evaluate and treat White with oxygen and an intravenous solution before transporting her to Detroit Receiving Hospital, where White was admitted for treatment. (*Id.*)

On June 8, 2014, at Detroit Receiving Hospital, Angela White became bradycardic and was pronounced dead at approximately 3:30 p.m. (ECF #37-16, Def.'s Mot. Ex. O, Detroit Medical Center Records, PgID 777.) An autopsy was conducted, and the medical examiner determined the cause of death to be Verapamil

toxicity, and the manner of death to be suicide. (ECF #37-17, Def.'s Mot. Ex. P, Post Mortem Report, PgID 800.)

## B. Neither White's May 2014 Hospitalizations Records Nor Notice of These Were Provided to the Canton Police or the Wayne County Jail by Angela White or Plaintiff Jacob Andrews.

### 1. Henry Ford Kingswood Records

On May 14, 2014, prior to her arrest on June 6, 2014, White had been admitted to the Henry Ford Hospital Kingswood Facility ("Kingswood") for two days, with diagnoses of major depressive disorder (moderate), chronic headaches, insomnia, and anxiety. (Pl.'s Resp., ECF #44-2, Ex. 1, PgID 1147.) White had been placed on suicide precautions while she was an inpatient at Kingswood, although she "denied overt suicidal ideation." (*Id.* at PgID 1147-48.) She was discharged on May 16, 2014. (*Id.*)

### 2. Sinai Grace Hospital Records

From May 22 through May 26, 2014, White had been admitted to Sinai Grace Hospital in Detroit, presenting with an altered mental state. (Pl.'s Resp., ECF #44-3, Ex. 2, PgID 1153.) No associated diagnosis was reached. (*Id.*) A May 25, 2014 Sinai Grace progress note stated that White "denied any feelings of depression" and "denied any current suicidal or homicidal ideation." (*Id.* at PgID 1153-54.) White reported that she had been "seen in the past for depression and suicide attempt by

Seroquel overdose by Psych consult service." (*Id.*) No timeframe was documented for the attempt. (*Id.*)

### 3. University of Michigan Hospital Records

On May 7, May 21 and May 28, 2014, White was seen by the University of Michigan Neurology Headache Clinic for an evaluation and follow-up care relating to chronic left-sided headache. (Pl.'s Resp., ECF #44-4, Ex. 3, PgID 1151-57.) From May 31 through June 1, 2014, White was hospitalized at the University of Michigan hospital for cellulitis treatment. (*Id.* at PgID 1158.)

Defendant Wayne County Jail had no knowledge of White's mental or physical health history, other than what she had disclosed during her intake and follow-up evaluation.

## C. The KOP Policy

The National Commission on Correctional Health Care ("NCCHC"), an organization that publishes the most widely-accepted healthcare standards for jail settings, allows for KOP programs, which "permit responsible inmates to carry and administer their own medications." (Dlugokinski Dep., ECF #37-9, Def.'s Mot. Ex. H., PgID 645, 27:21-28:22; Pl.'s Resp., ECF #44-18, Ex. 17, PgID 1305.) The NCCHC does not define "responsible inmate," but Dr. Dlugokinski testified at his deposition that "a responsible inmate would generally be one who is lucid, organized, composed, not demonstrating any signs of major mental illness,

hallucinations, delusions; in other words, being reality-focused and -based, not advising or demonstrating that they would be at any risk for harming them self or anybody else, one whose judgment would be within…normal limits of what we would expect from an adult." (Dlugokinski Dep., ECF #37-9, Def.'s Mot. Ex. H, PgID 645-46, 29:7-31:10.) The Jail's KOP policy had been in effect, subject to revisions, since January 1, 1998. (ECF #37-11, Def.'s Mot. Ex. J, PgID 740.) The 2012 version of the KOP policy (in effect as of June 2014) explicitly excluded all inmates housed in the mental health unit. (ECF #37-11, Def.'s Mot. Ex. J, PgID 740.) The 2012 version of the KOP policy stated:

> It is the policy of Wayne County Jail Health Services (WCJHS) that R.N's/L.P.N.'s [sic] shall distribute non restricted medications for the Self Medication Program to patient/inmates in the general population and medical special housing so that they can store and administer their own medications. All psychotropic medications will be nurse dispensed regardless of the location of the inmate. Inmate/patients who reside on the mental health unit will be excepted from the Self Medication Program and as such all medications to Mental Health Unit patients will be Nurse administered. WCJHS reserves the right to restrict self administration privileges to any inmate if necessary to assure the safety and security of the patient, other inmates or the institution. A current drug list will be posted in all medication books and clinical areas at all times.

(ECF #37-11, Def.'s Mot. Ex. J, PgID 740.)

The policy had been revised in October 2012 to reflect the exclusion of the inmates housed on the mental health unit. (*Id.*) Prior to October 2012, the KOP policy excluded any inmate on psychotropic medication from participation in the

15

KOP medication self-administration program. (Clafton Dep., ECF #37-18, Def.'s Mot. Ex. Q, PgID 821, 56:1-11.) The version of that policy in effect from 2009 to October 2012 stated:

> It is the policy of Wayne County Jail Health Services (WCJHS) that R.N.'s/L.P.N.'s [sic] will distribute non restricted medications for the Self Medication Program to responsible patients/inmates in the general population only to carry and administer their own medications. The self medication program is restricted to patients/inmates who do not receive any psychotropic medications inclusive of the present restricted drug list. All psychotic [sic] medications for patients/inmates will be nurse dispensed regardless of his/her location. A current drug list will be posted in all medication books and clinical areas at all times.

(ECF #44-17, Pl.'s Resp. Ex. 17, PgID 1301.) That policy was amended in October 2012.

As stated in the 2012 KOP policy, the Jail reserved the right to prohibit any inmates from participation in the program for safety purposes.[7] Further, inmates housed outside of the mental health unit were ineligible for the KOP program if he or she: (1) demonstrated acute mental illness; (2) exhibited behavior management issues; and/or (3) had a history of medication abuse, such as hoarding or trading pills. (Dlugokinski Dep., ECF #37-9, Def.'s Mot. Ex. H, PgID 653, 61:10-18.) The "Nurse Administered Medications" list also stated that "Drugs may be restricted by

---

[7] This explicit exclusion for safety purposes was added to the KOP policy when it was revised in 2012. (ECF #37-11, Def.'s Mot. Ex. J, PgID 740.)

the prescriber for an individual whose compliance warrants close monitoring." (Def.'s Mot., Ex. J, ECF #37-11, PgID 741.)

The "Nurse Administered Medications" list set forth five categories of medications that were "restricted to individual dose administration" due to "abuse potential" or the need for "patient compliance." (*Id.*) The five categories were: (1) tuberculosis medications; (2) miscellaneous drugs (including Catapres); (3) psychotropic antidepressant medications; (4) psychotropic antipsychotic medications; and (5) antiretroviral medications. (*Id.*) As discussed above, it was Jail standard practice to allow inmates participating in the KOP program to keep 20 to 30 days of non-restricted medication in their cells. (Dlugokinski Dep., ECF #37-9, Def.'s Mot. Ex. H, PgID 646, 31:5.) The blood pressure medication Catapres was on the list of "miscellaneous" restricted medications because inmates were likely to abuse it due to the drug's sedative side effect. (ECF #37-11, Def.'s Mot. Ex. J, KOP policy, PgID 743; Clafton Dep., ECF #37-18, Def.'s Mot. Ex. Q, PgID 819, 48:1-13; Dlugokinski Dep., ECF #37-9, Def.'s Mot. Ex. H, PgID 653-54, 58:6-16, 59:3-6.) "Abuse" included inmates trading the drug amongst themselves and/or obtaining and using the drug for non-prescribed reasons. (Dlugokinski Dep., ECF #37-9, Def.'s Mot. Ex. H, PgID 653, 58:6-16.) Dr. Dlugokinski testified that Catapres had "value on the trade market in the jail, inasmuch as it has sedating components…." (*Id.* at PgID 653, 59:3-6.) Drs. Clafton and Dlugokinski testified that inmates sought

out Catapres for use as a sleep aid. (*Id.*; Clafton Dep., ECF #37-18, Def.'s Mot. Ex. Q, PgID 819, 48:1-13.) Verapamil, while also a blood pressure medication, was not on the restricted list because it had no sedative side effect, and, therefore, was not considered prone to abuse by inmates. (*Id.*)

Dr. Dlugokinski testified that the KOP program's objectives included: (1) empowering inmates to participate in their own healthcare, as if they were not incarcerated; (2) improving the timeliness of medication administration; (3) enhancing safety and preventing emergencies by permitting inmates to take vital medication as needed; and (4) allowing Jail medical staff time required for more in-person patient care. (Dlugokinski Dep., ECF #37-9, Def.'s Mot. Ex. H, PgID 645-46, 29:7-31:10.)

Approximately six to seven weeks after White's death, the KOP policy was amended to add and recategorize various drugs on the restricted "Nurse Administered Medications" list. That included adding Verapamil to the "miscellaneous" drug category. (Clafton Dep., ECF #37-18, Def.'s Mot. Ex. Q, PgID 645-46, 29:7-31:10; Pl.'s Resp. Ex. 18, ECF #44-19, PgID 1306-08.)

### III.   STANDARD OF REVIEW

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). A fact is "material" for purposes of a

summary judgment motion where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Midwest Media Prop., L.L.C. v. Symmes Twp.*, Ohio, 503 F.3d 456, 469 (6th Cir. 2007) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Rule 56(e) identifies affidavits, depositions, and answers to interrogatories as appropriate items that may be used to support or oppose summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 247 (6th Cir. 1991) (internal quotation marks omitted) (quoting *Celotex*, 477 U.S. at 323). If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322. "[A] complete failure of proof

concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id*. at 323.

"The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal citations and quotation marks omitted). The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587 (1986) (footnote and internal quotations omitted).

In making the determination on summary judgment whether there are genuine issues of material fact for trial, the court must draw all reasonable inferences in favor of the non-moving party. *See Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015). "'The central issue is whether the evidence presents a sufficient disagreement

to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)). At the same time, plaintiff must produce enough evidence to allow a reasonable jury to find in his favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute is not enough." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citations omitted).

Ultimately, the party who bears the burden of proof must present a jury question as to each element of the claim. *See Davis*, 226 F.3d at 511. Plaintiff cannot meet that burden by relying solely on "[c]onclusory assertions, supported only by [his or her] own opinions." *Arendale v. City of Memphis*, 519 F.3d 587, 560 (6th Cir. 2008). Plaintiff must show probative evidence, based "on more than mere speculation, conjecture, or fantasy," to prevail. *Id.* at 601 (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)).

All evidence submitted in opposition to a motion for summary judgment must ultimately be capable of being presented in a form that would be admissible at trial:

> The submissions by a party opposing a motion for summary judgment need not themselves be in a form that is admissible at trial. Otherwise,

21

affidavits themselves, albeit made on personal knowledge of the affiant, may not suffice, since they are out-of-court statements and might not be admissible at trial. *See* Fed. R. Evid. 801(c), 802. However, the party opposing summary judgment must show that she can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary. Such "'evidence submitted in opposition to a motion for summary judgment must be admissible.'" *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (quoting *United States Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir.1997)). That is why "'[h]earsay evidence . . . must be disregarded.'" *Ibid.* It is also the basis of this court's repeated emphasis that unauthenticated documents do not meet the requirements of Rule 56(e).

*CareSource*, 576 F.3d at 558-59 (internal citations omitted).

A court "may not make credibility determinations or weigh the evidence" in ruling on motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000).

## IV.   ANALYSIS

### A.  Municipal Deliberate Indifference Claims

It is Plaintiff's position that the Wayne County Jail's KOP policy and/or its failure to train its administrators and staff with regard to suicide assessment amounted to deliberate indifference towards White's serious medical needs. Pre-trial detainees have the right to adequate medical treatment analogous to those of convicted prisoners. These rights stem from the Due Process clause of the Fourteenth Amendment instead of the Eighth Amendment. *City of Revere v. Massachusetts General Hosp.*, 463 U.S. 239, 244 (1983) ("[T]he due process rights of a [pre-trial

detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner."). To prevail on a Title 42 U.S.C § 1983 claim against a municipality, a plaintiff must show that the municipality's deliberate action or inaction was the "moving force" behind the violation of constitutional rights. *Perez v. Oakland County*, 466 F.3d 416, 430 (6th Cir. 2006). Section 1983 limits municipal liability to the violation of some "official policy" attributable to the municipality, which may originate from acknowledged government lawmakers or those in positions of responsibility "whose edicts may fairly be said to represent official policy." *Monell v. Dep't. of Soc. Servs. of the City of New York*, 436 U.S. 658, 694 (1978). A plaintiff attempting to establish municipal liability pursuant to Section 1983 may demonstrate three categories of "official policy": (1) an express policy or custom of the municipality; (2) a final policymaker's conduct;[8] or (3) the municipality's failure to train employees. *See Board of County Comm'rs of Bryan County, OK v. Brown*, 520 U.S. 397, 397–398 (1997). Here, Plaintiff's claims fall under the first and third categories of policies.

---

[8] Plaintiff cites *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) for his argument that a single violation occurrence may subject a municipality to liability, but *Pembaur's* holding was in the context of municipal liability due to a final policymaker's conduct. There is no indication that Plaintiff proceeds on that theory here.

## 1. Municipal Liability for an Express Policy

Plaintiff asserts that the Jail KOP policy, which permitted White to keep and self-administer Verapamil, demonstrates Defendant Wayne County's deliberate indifference to White's serious medical needs. "A plaintiff asserting a section 1983 claim on the basis of a municipal custom or policy must identify the policy, connect the policy to the County itself and show that the particular injury was incurred because of the execution of that policy." *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004) (internal citations and alterations omitted). *See also Board of County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 404 (1997) ("[A] plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.").

The KOP policy permitted mentally stable inmates to participate in the self-administration program – participating inmates could not keep restricted medications in their cells.[9] Defendant contends that Verapamil was not on the restricted medication list under the KOP policy because it was not prone to abuse as

---

[9] Plaintiff argues that Defendant must provide a reason for changing the KOP policy participation provision from disallowing participation by any inmate on psychotropic medication to disallowing participation by any inmate on the mental health unit. Dr. Dlugokinski provided several reasons in support of the policy change (discussed *supra*).

was Catapres. Defendant further contends that White appeared mentally stable, and accordingly was permitted to participate in the KOP program. There was no cause for concern that she would attempt to harm herself by overdosing on Verapamil. (*See* Clafton Dep., ECF #37-18, Def. Mot. Ex. Q, PgID 819, 47:4-13.)

Defendant contends that White did not indicate in any way that she was suicidal or mentally unstable prior to the time of her overdose. The sole indication of discord in her mental state is Nurse DeAngeles Guest's deposition testimony that White became upset when she could not reach anyone, in particular, Plaintiff Andrews, on the phone during the afternoon of June 7, 2014 – the day after her intake assessment and follow-up evaluation. (Dep. of DeAngeles Guest, Aug. 19, 2018, ECF #37-15, Def.'s Mot. Ex. N, PgID 763, 18:10-16.) Contrary to Plaintiff's assertion, the KOP policy did not interfere with Carnill's follow-up on White's initial interview with Benette. When questioned by the initial intake screener, Medical Assistant Benette, and then by Nurse Carnill during the mental health evaluation follow-up, White consistently denied having current suicidal ideations, and she did not demonstrate any observable symptoms of psychiatric distress or signs that she was likely to harm herself. Benette and Carnill each independently determined that White was mentally stable, and therefore neither of them considered her for placement in the mental health unit. Benette cleared White for housing in the Jail general population, and Carnill housed her in the Jail infirmary so she could

readily access the oxygen treatment as needed for her migraine headaches. As Carnill testified, if he had perceived that White was going to harm herself, he would have contacted the on-call psychiatrist, and he would have admitted her to the mental health unit under suicide precautions.

Defendant also contends that nothing in the KOP policy prevented Carnill from placing White in the mental health unit at the time of his evaluation if she appeared mentally unstable. Further, the KOP policy permitted Carnill to house White in the infirmary and completely restrict her medications if he believed that she somehow posed a safety risk to herself. To the contrary, White's responses to the intake questionnaire, the follow-up evaluation, and her behavior indicated that she was not mentally ill (acutely or otherwise) at that time.[10] Jail intake screener Dawn Benette's isolated knowledge that White had attempted suicide at some point "in the past," and Carnill's isolated knowledge that she was prescribed an anti-depressant and an anti-anxiety medication do not evince that the KOP policy caused White's suicide. As discussed above, Carnill testified at his deposition that he would have housed White on the mental health unit had he believed that she was likely to harm herself, and, accordingly, she would not have had access to any medications

---

[10] Notably, Plaintiff Jacob Andrews has never proffered evidence of when a past suicide attempt occurred. Sinai Grace Hospital records note only that White's reported suicide attempt had been "in the past."

under the KOP policy. Indeed, the reason Carnill referred White for further mental health evaluation with a social worker was due to the fact that she was prescribed psychotropic medications, not because she exhibited or reported psychiatric distress.

Plaintiff alleges that the KOP policy allowed White to participate in the KOP program when her housing was "unsettled," but that was not the case. Because she presented as mentally stable, White was never a candidate for the mental health unit – her housing was not "unsettled" or "pending" with regards to the mental health unit. (*See* Clafton Dep., ECF #37-18, Def.'s Mot. Ex. Q, PgID 827, 70:7-11.) Both Benette and Carnill determined that White would be housed in the general population (of which the infirmary was a subset).[11] Moreover, the KOP policy allowed discretion for the Jail staff to restrict inmates' access to medications and from participation in the KOP program when they were not on the mental health unit, if they were acutely mentally ill, had behavioral issues, or deemed likely to abuse medication. The policy explicitly stated that Jail staff could restrict any inmate's participation for safety reasons. Defendant contends that White did not

---

[11] While Plaintiff spends a significant portion of his Response on the actions and decisions of individual Jail staff, the Complaint does not contain claims against individuals in their official capacity or otherwise. The Sixth Circuit has held that "[a] party may not raise a new claim for the first time in a response to a motion for summary judgment." *Rafferty v. Trumbull Cnty.*, 758 F. App'x 425, 429 (6th Cir. 2018). The only claims at issue are those against Defendant Wayne County.

present any type of safety concern whatsoever at the time of her intake, so Carnill permitted her to keep the Verapamil.

While it is tragic that White took her own her life by overdosing on the Verapamil pills kept in her cell, within 24 hours of detainment, "[t]he fact that alternative procedures might have better addressed [a prisoner's] particular needs does not show that the [County was] deliberately indifferent to [her] medical needs." *Graham ex rel. Estate of Graham*, 358 F.3d at 384 (alterations in original).[12]

### 2. Failure to Train Claim

To the extent Plaintiff alleges that Wayne County Jail was deliberately indifferent by maintaining a policy of failing to train its employees in suicide risk assessment (*see* Am. Compl., ECF #31, PgID 299, ¶44(k)-(l)), those claims also cannot survive summary judgment. In a municipal deliberate-indifference case, the claimant must show not only that an employee's act caused a constitutional tort, but also that the municipality's failure to train its employees caused the employee's violation and that the city culpably declined to train its employees to handle recurring situations presenting an obvious potential for such a violation. *Arrington-Bey v. City of Bedford Heights, Ohio*, 858 F.3d 988, 995 (6th Cir. 2017), *cert. denied*, 138 S. Ct.

---

[12] Dr. Dlugokinski testified at his deposition that, other than the incident involving White, there have been no overdose events related to the KOP policy since its inception. (Dlugokinski Dep., ECF #37-9, Def.'s Mot. Ex. H, PgID 665, 107:4-109:4, PgID 666, 111:14-112:15.)

738 (2018). "[O]bvious potential for such a violation" has two elements: (1) it must be obvious that the failure to train will lead to certain conduct; and (2) it must be obvious (*i.e.*, clearly established) that the conduct will violate constitutional rights. *Id*. "In other words, the risk of a constitutional violation arising as a result of the inadequacies in the municipal policy must be plainly obvious." *Jackson v. City of Cleveland*, -- F.3d.--, No. 17-3840/3843, pg. 51 (6th Cir. May 20, 2019) (quotations omitted). In this case, no constitutional tort was committed because there is no right of detainees to receive suicide screenings unless the detainee has somehow demonstrated a strong likelihood of committing suicide. *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005).

In *Gray v. City of Detroit*, 399 F.3d 612 (6th Cir. 2005), the Sixth Circuit affirmed summary judgment for the individual[13] and municipal defendants where a pre-trial detainee committed suicide after destroying his holding cell, demonstrating mood swings, undergoing hospitalization for chest pains, and requiring handcuffing to restrain his agitated behavior, all during the 24-hours of detainment prior to his death. *Gray* at 614. Officers testified that, despite his erratic and destructive behavior, the detainee never appeared suicidal and did not indicate to any personnel at any time that he was suicidal during the course of two mental health screenings.

---

[13] The *Gray* court undertook a qualified immunity analysis as to the jail staff defendants named in their official capacities before turning to the issue of municipal liability for alleged failure to train.

The court re-affirmed its earlier holding from *Barber v. City of Salem*, 953 F.2d 232, 239-40 (6th Cir. 1992):

> [T]he proper inquiry concerning the liability of a City and its employees in both their official and individual capacities under section 1983 for a jail detainee's suicide is: whether the decedent showed a strong likelihood that he would attempt to take his own life in such a manner that failure to take adequate precautions amounted to deliberate indifference to the decedent's serious medical needs.

*Gray*, 399 F.3d at 616.

Cited in *Gray*, *Barber* had also confirmed the holding of *Danese v. Asman*, 875 F.2d 1239, 1244 (6th Cir. 1989), that there is no general constitutional right to of detainees to receive suicide screenings unless the detainee has somehow demonstrated a strong likelihood of committing suicide. *Id*. The court in *Gray* found that the decedent had not demonstrated a "strong likelihood" of committing suicide. *Id.*

The *Gray* court also addressed the potential for municipal liability where there is no individual employee liability, as in this case. The court stated, "Assuming for the sake of argument that this Circuit permits a municipality to be held liable in the absence of any employee's committing a constitutional violation, the remaining question for us then is whether the City's policymakers' decisions regarding suicide prevention were themselves constitutional violations…." *Id.* at 617. The Sixth

Circuit applied the objective "obviousness" standard to municipal claims such as White's:

> A municipality may be liable under § 1983 where the risks from its decision not train its officers were "so obvious" as to constitute deliberate indifference to the rights of its citizens. As applied to suicide claims, the case law imposes a duty on the part of municipalities to recognize, or at least not ignore, obvious risks of suicide that are foreseeable. Where such a risk is clear, the municipality has a duty to take reasonable steps to prevent the suicide.

*Id.* at 617-18.

Although in *Gray* it was undisputed that the policies regarding suicide prevention were constitutionally sufficient, the plaintiff also argued that the jail employees' training was deficient. *Id*. at 618. Here, as in *Gray*, White did not indicate in any way that she was suicidal. Plaintiff does not provide evidence that clears the hurdle of "obviousness" to proceed with his failure to train claim regarding suicide assessment. In other words, the Wayne County Jail did not violate its duty to recognize an obvious*,* foreseeable risk of suicide. *See Gray*, 399 F.3d at 618. White's risk of suicide on the night she was transferred to Wayne County Jail was not "obvious" or "clearly foreseeable" so as to require a suicide assessment. White appeared mentally stable, did not report any suicidal ideation during the duration of her detainment, denied suicidal ideation or thoughts of self-harm when asked at intake or the follow-up, and no family members – in particular her fiancé who lived

with her, Plaintiff Jacob Andrews – expressed any concerns to the Jail (or the Canton Police Department, for that matter) about suicide risk.

As for Carnill's training, to reiterate, Carnill testified at his deposition that if White had stated she was suicidal or if his observations during the two-hour physical and mental health follow-up evaluation that he conducted led him to believe that she at risk of self-harm, he would have taken a different course of action, including placing White under suicide precautions, phoning the on-call psychiatrist, and housing White on the mental health unit where she could not have accessed any medication.

Under *Gray*, a pre-trial detainee does not have the right to receive suicide screenings, "unless the detainee has somehow demonstrated a strong likelihood of committing suicide," *Gray* at 616, which White did not. *See also Estate of Harbin v. City of Detroit*, 147 F. App'x 566, 576 (6th Cir. 2005) ("Plaintiff cannot show that the City made a deliberate choice not to provide the officers with the necessary training or that such a decision caused Plaintiff's alleged constitutional violation.") (Russell, concurring).

White had received two separate interviews/questionings by Wayne County Jail health professionals about her physical and mental health before her suicide. Her responses did not express suicidal ideation, nor did their evaluations evidence such.

The Court finds that the facts do not establish that White appeared suicidal, nor did she express suicidal ideations. Both Benette and Carnill indicated that White receive further mental health attention based on factors other than suicide risk. The record does not reflect deliberately indifferent conduct by the Wayne County Jail toward Angela White.

## V.    CONCLUSION

Based on the reasons stated above, the Court GRANTS Defendant Wayne County's Motion for Summary Judgment.

IT IS SO ORDERED.


Dated:  August 9, 2019                                s/Paul D. Borman
                                                      Paul D. Borman
                                                      United States District Judge